**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| SAMUEL WILSON,<br><br>     Plaintiff,<br><br>v.<br><br>KEVIN SMITH,<br><br>     Defendant. | Case No. 22 C 04413<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Samuel Wilson, a business owner, filed this action under 42 U.S.C. § 1983 against Defendant Kevin Smith, a retired investigator for the Office of the Illinois State Fire Marshal, alleging violations of Plaintiff's Fourth and Fifth Amendment rights. Specifically, Plaintiff contends that Defendant fabricated evidence in connection with an arson investigation at Plaintiff's bar. Plaintiff was subsequently arrested and ultimately acquitted of all charges after a bench trial. Defendant has now moved for summary judgment (Dkt. 17) on both of Plaintiff's claims. For the reasons discussed below, Defendant's motion for summary judgment is granted.

**BACKGROUND**

**I.   Plaintiff's Acquisition of the Bar and Prior Instances of Vandalism**

In February 2014, Plaintiff purchased Levels Sports Bar ("Levels"), located at 2408 Sauk Trail, Sauk Village, Illinois, 60411, from Thomas Gorski. (Dkt. 39 at ¶¶ 4, 6).[1] Plaintiff purchased the contents and fixtures inside the bar, but not the real estate itself, and entered into a five-year

---

[1] The facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted. The Court refers to Plaintiff's Response to the Defendant's Local Rule 56.1 Statement of Facts as "Dkt. 39" and Defendant's Responses to Plaintiff's Statement of Additional Material Facts as "Dkt. 44."

commercial lease with Gorski, with an initial monthly rent of $1,500. (*Id.* at ¶¶ 7-9). From at least February 2015 through February 2016, Plaintiff had property insurance for Levels. (*Id.* at ¶ 12).

Starting in October 2015, Plaintiff says that Levels was subjected to a pattern of nighttime vandalism, which included windows being busted out, a custom sign being snatched down and vandalized, and a dumpster being knocked over and trash thrown about the parking lot. (Wilson Dep. at 119:14-17, 124:3-8, 127:17-24, Dkt. 18-4; Dkt. 44 at ¶ 1). Plaintiff never filed any police reports or insurance claims regarding those instances of vandalism. (Dkt. 39 at ¶¶ 24, 27). But Plaintiff claims the vandalism prompted him to monitor the bar after closing in an attempt to catch the culprits. (Dkt. 44 at ¶ 1). According to Plaintiff, he first conducted nighttime surveillance of the bar on October 23, 2015, which was unsuccessful. (*Id.* at ¶ 2).

## II.     October 24, 2015 Surveillance by Plaintiff and Fire at Levels

The next day, October 24, 2015, Plaintiff claims that he again conducted surveillance of the bar during the early morning hours, from a vacant property southwest of the bar, across a shallow, dry drainage ditch that was approximately three feet wide. (Dkt. 44 at ¶ 2). This property, which was a home, was located at 2503 221 Street, Sauk Village, IL, 60411. (Dkt. 39 at ¶ 28). The parties dispute exactly how far the property was from the Levels. (Dkt. 44 at ¶ 3). Plaintiff parked in the driveway of the home and walked into the backyard, which bordered the drainage ditch and looked over Levels. (*Id.* at ¶ 3).

At some point, Plaintiff says that he observed an individual with a slender build walking eastbound down Sauk Trail and approaching the west side of Levels, which then prompted Plaintiff to walk through an open gap in a damaged fence, hop over the drainage ditch, and enter the Levels parking lot. (*Id.* at ¶ 4). According to Plaintiff, the person was an African American male with dreadlocks who had his face covered. (*Id.* at ¶ 5; Wilson Dep. at 179:18-24, Dkt. 18-4). The man

2

was standing by a window and striking a device that produced a flame, which Plaintiff presumed was a lighter. (*Id.* at ¶ 5). Plaintiff claims that he was standing about six feet away from the man, who appeared to have broken a window and started a fire on the windowsill. (*Id.* at ¶ 6). After seeing this, Plaintiff states that he rushed the man and grabbed him, but the man pulled away, punched Plaintiff, and ran east. (*Id.* at ¶ 7).

### III. <u>Officer Vaughan's Patrol and Observations</u>

On October 24, 2015, at 4:17 a.m., Sauk Village Police Officer Andrew Vaughan was on patrol. (Dkt. 39 at ¶ 13). While driving eastbound on Sauk Trail, he observed a subject walking southbound through the Levels parking lot. (*Id.*). According to Officer Vaughan, the subject was wearing a hood that covered his face, which appeared to be a mask. (*Id.* at ¶ 14). Officer Vaughan also testified that he saw the subject for less than five seconds and only saw the individual's back. (*Id.*; Vaughan Dep. at 18:19-19:7). After circling the building and pulling into the parking lot, which took approximately 15 to 20 seconds, Officer Vaughan saw someone, who turned out to be Plaintiff, appear from the northwest corner of the building and wave him down. (Vaughan Dep. at 22:7-10; Dkt. 39 at ¶¶ 15-16; Dkt. 44 at ¶ 8). Officer Vaughan testified that the individual he saw before pulling into the parking lot was the same person he saw after pulling into the parking lot, and that was Plaintiff. (Dkt. 39 at ¶¶ 16-17).

After Plaintiff informed Officer Vaughan that a suspect had fled eastbound on foot, Officer Vaughan ran east in pursuit but did not see anyone else. (Dkt. 39 at ¶¶ 18-19; Dkt. 44 at ¶¶ 8-9). Officer Vaughan stated the only person he saw while driving eastbound on Sauk Trail, circling the building, running eastbound, and canvassing the immediate area was Plaintiff. (Dkt. 39 at ¶ 19). Officer Vaughan observed something lying on the ground which appeared to be a mask. (*Id.* at ¶ 20). A small fire was burning inside a broken window to the east of a bar door facing Sauk Trail.

(*Id.* at ¶¶ 20-21). Plaintiff extinguished the fire by blowing and tapping the flames with his gloved hand, but Officer Vaughan nevertheless radioed to dispatch the fire department. (Dkt. 39 at ¶¶ 20, 22; Dkt. 44 at ¶ 10). Plaintiff also saw a partially burned plastic bottle on the windowsill, which he threw to the sidewalk and stamped to extinguish. (Dkt. 44 at ¶ 11). The fire caused damage to the windowsill and scorched a beer sign. (*Id.* at ¶ 10). Officer Vaughan testified both that he did not recall whether he saw a plastic bag and that he did not remember seeing a plastic bag in front of the broken window. (*Id.* at ¶ 12; Vaughan Dep. at 38:15-19; 132:23-133:2, Dkt. 18-6).

Plaintiff explained to Officer Vaughan that his bar had been previously vandalized in October 2015. (Dkt. 39 at ¶ 23). As a result, he had decided to take "justice in [his] own hands" and so, on the early morning of October 24, 2015, Plaintiff had been waiting in the backyard of a vacant home near Levels to try to catch the vandals. (Dkt. 39 at ¶ 23; Dkt. 44 at ¶ 20). Plaintiff told Officer Vaughan how he saw a subject walking towards the bar who broke a window and started a fire and Plaintiff approached him and was punched. (Dkt. 39 at ¶ 25). Officer Vaughan drafted a report of the incident, in which he noted that the Plaintiff showed him a bump on his head, which Plaintiff contended was from that punch. (Dkt. 44 at ¶ 12). Officer Vaughan eventually drove Plaintiff to retrieve his vehicle from the vacant property, and both returned to Levels in their own vehicles. (Dkt. 39 at ¶¶ 28, 30).

Sometime on the morning of the fire, Officer Vaughan spoke with a neighbor who stated that he saw an individual of slim build run thought his yard earlier that morning. (Dkt. 44 at ¶ 9). The neighbor wished to remain anonymous and was generally uncooperative. (*Id.*; Vaughan Dep. at 62:10-24, Dkt. 18-6). The parties dispute exactly where and when this conversation took place. Plaintiff says it occurred across the street from Levels, while Defendant says it occurred across the street from the vacant home where Plaintiff had parked his car. (Dkt. 44 at ¶ 9). Furthermore,

Plaintiff states the conversation occurred shortly after Officer Vaughan arrived on scene, while Defendant says it simply occurred sometime before Officer Vaughan drove Plaintiff to the vacant property to retrieve his vehicle, which Officer Vaughan estimates to be about an hour after he arrived on the scene. (*Id.* at ¶ 9).

## IV. Arrival of Fire Department, Additional Law Enforcement Personnel, and Defendant and Subsequent Investigation at the Scene

Several members of both the Sauk Village and Crete Fire Departments and Officer Vaughan's commanding officer arrived at Levels before Defendant. (Dkt. 39 at ¶ 35). Sauk Village fire personnel arrived at 4:30 a.m. (Dkt. 44 at ¶ 13). Officer Vaughan and two firemen entered Levels and noted a strong odor of gasoline inside the bar. (Dkt. 39 at ¶ 37).

Defendant was assigned by the Office of the State Fire Marshal to investigate the arson. (*Id.* at ¶ 34). While some witnesses testified that Defendant arrived on scene around 5:15-5:30 a.m., Defendant testified that he arrived at 6:00 a.m. (Dkt. 44 at ¶ 13). Special Agent John Gamboa from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") arrived after Defendant. (Dkt. 39 at ¶ 38). The parties dispute what Defendant did when he first arrived on the scene. Defendant states that the first thing he did upon arrival was to have Plaintiff sign a consent form giving him and SA Gamboa permission to enter Levels. (Dkt. 39 at ¶ 39; Dkt. 44 at ¶ 16). Plaintiff, however, contends that after Defendant arrived, he approached Plaintiff's vehicle (in which Plaintiff was sitting), peered in and appeared to recognize Plaintiff, inspected the scene, and then asked Plaintiff to sign a consent form. (Dkt. 39 at ¶ 39; Dkt. 44 at ¶ 16). Plaintiff also says that Defendant entered the bar prior to the consent form being signed; Defendant insists he received Plaintiff's consent before entering Levels. (Dkt. 39 at ¶ 40; Dkt. 44 at ¶ 16).

The parties do not dispute, however, that when he signed the consent form, Plaintiff explained to Defendant that he had staked out the bar to catch vandals, he saw someone light

5

something and put it in the broken window, he confronted the person, and the person struck him and fled. (Dkt. 44 at ¶ 17). Further, the parties do not dispute that before entering Levels, Defendant canvassed the outside of the building, took photographs, and collected evidence, including a plastic bottle, plastic Menards bag, paper towel roll, lighter, and hammer. (Dkt. 39 at ¶¶ 42-43). Defendant's incident report specifically notes, among other things, that a "White plastic Menards bag with 1/3 of a roll of white paper toweling" was processed as evidence. (Office of the Illinois State Fire Marshal Incident Report at 15, Dkt. 18-44). Plaintiff contends that the plastic Menards bag and paper towel roll were removed from the bar and placed under the broken window by Defendant, while Defendant says these items were simply found under the broken window. (Dkt. 39 at ¶ 43; Dkt. 44 at ¶ 22). There is no debate that the plastic bottle was found under the broken window, the lighter was found in the southwest area of the parking lot, and the hammer was found behind the bar inside the building. (Dkt. 39 at ¶ 43). A laboratory report, dated December 11, 2015, indicated that Plaintiff's DNA was found on the paper towel roll, which Plaintiff asserts may be because he handled the paper towels while cleaning the bar. (Illinois State Police Laboratory Report, Dkt. 18-33; Dkt. 39 at ¶ 44; Dkt. 44 at ¶ 22).

Neither Plaintiff nor any other witness observed Defendant remove either a paper towel roll or plastic Menards bag from inside of the bar and/or place them beneath the broken window where the fire had been burning. (Dkt. 39 at ¶ 45). In a photograph of Plaintiff signing a document while sitting in his vehicle, a plastic bag is visible outside of the bar. (Dkt. 39 at ¶ 41).

According to Plaintiff, he fell asleep in his car during the investigation. (Dkt. 44 at ¶ 18). He was eventually interviewed inside of Levels by Defendant and SA Gamboa, and SA Gamboa drafted a report memorializing this interview. (Dkt. 39 at ¶¶ 46-47; Dkt. 44 at ¶ 19). Plaintiff provided the following hand-written statement to investigators:

> After several week of vandalism, with no justice, I decided to take justice in my own hands. Not the smartest decision, but it was what I decided to do. After closing hours, I stayed in location where I could easily see anyone approaching location. When I saw someone I approached them in an aggressive manner. He was lighting fire towards window. I grabbed him and in effort to slam him, but he pushed off and punched me on my head. I stumbled backwards and waved down officer and we both gave chase. Came back to site of fire and patted fire source with hands and feet.

(Dkt. 44 at ¶ 20).

## V.    Observations of Additional Personnel on Scene

Some fire department personnel took notes about the arson. (Dkt. 44 at ¶ 14). For example, firefighter Dan Smits did not mention a plastic bag with a paper towel in his notes. (*Id.*). Smits testified that while he would have preferred to make a note of a plastic bag with paper towels if he saw it and generally would have noted that, he could not say that a plastic bag with paper towels was not at the scene. (Smits Dep. at 19:17-23, Dkt. 18-9). Another firefighter, Zackary Newton, did not make note of a plastic bag with a paper towel either. (Dkt. 44 at ¶ 14). Newton testified that if he had seen a plastic bag and he felt that plastic bag was pertinent to his investigation when he arrived on scene, he would have noted it. (Newton Dep. 15:19-24; Dkt. 18-11). He did not remember there being a plastic bag. (*Id.* at 16:4-6). A third fireman, Edward Myers, did not make note of a plastic bag at the scene. (Dkt. 44 at ¶ 14). Myers testified that it was possible that there could have been periods of time when nobody was monitoring what was occurring outside of the bar's front door. (*Id.* at ¶ 15). Finally, fireman Doug Luther noted that he observed a plastic bag on the ground outside of Levels. (Dkt. 39 at ¶ 36; Dkt. 44 at ¶ 14).

## VI.   Defendant Smith's Investigation of the Arson After October 24, 2015

During his investigation, Defendant learned from Gorski that Plaintiff had fallen roughly $9,000 behind in rent payments as of October 2015. (Dkt. 39 at ¶¶ 10, 51). While Plaintiff admits that he was behind in rent, he contends that he made certain repairs and improvements to the real

7

estate and while he and Gorski disagreed over the value of these improvements, Plaintiff believed they covered his outstanding rent. (*Id.*). Defendant also learned that Gorski had already sent Plaintiff an email advising him that if he did not pay his past due rent in full, Gorski would begin the eviction process. (Dkt. 39 at ¶ 51).

ATF Agent Anthony Zito was assigned to the case in July 2016. (Dkt. 44 at ¶ 24; Zito Dep. at 14:24-15:4). On July 20, 2016, SA Gamboa emailed a report to Agent Zito that summarized his interview with Plaintiff. (Dkt. 44 at ¶ 25). SA Gamboa then retired in December 2016. (Gamboa Dep. at 71:21-72:2). On February 7, 2017, Agent Zito forwarded SA Gamboa's report to Defendant, who returned an edited version of the report which added, among other things, the following paragraph:

> Mr. Wilson stated that he observed the offender carrying a white plastic bag in his hand as he approached the front of the business. Mr. Wilson denied handling the white plastic bag or its contents inside the bag [sic], including the melted remains of a plastic bottle found lying on the ground beneath the broken window. Mr. Wilson reiterated again that the person responsible for starting the fire brought the plastic bag with him and that he did not touch, move, or come into contact with the plastic bag, the bottle, or its contents.

(Dkt. 44 at ¶¶ 28-29). By that time, SA Gamboa had already retired and thus did not review Defendant's edits to the report. (*Id.* at ¶ 28). SA Gamboa's original report did not mention that the offender carried a plastic bag to the scene, nor did it mention that Plaintiff denied touching a plastic bag. (*Id.* at ¶ 30).

Also in July 2016, Defendant and Agent Zito interviewed Levels employees during their investigation. (Dkt. 39 at ¶¶ 48-50). One employee reported that Levels was poorly run, the alcohol was rarely restocked in a timely manner, employees were not paid in a timely fashion, she had never seen an alcohol distributor at the bar, and that Plaintiff was not responsible. (*Id.* at ¶ 49). Another employee similarly reported that the bar would regularly run out of alcohol, she was

sometimes paid late, there were times when there was insufficient change in the cash register to make change for customers, Levels had inconsistent hours of operation, she believed the bar was failing due to poor management, and she once overheard Plaintiff tell a patron that he was tired of owning the bar. (*Id.* at ¶ 50).

Defendant and Agent Zito identified the individuals who had vandalized the bar on prior occasions. (Dkt. 39 at ¶ 52; Dkt. 44 at ¶ 34). They referred these individuals to the Sauk Village Police Department but state that they did not suspect them of the arson, which Plaintiff disputes. (Dkt. 39 at ¶ 52).

Defendant also contends that on at least five different occasions between May 2014 and June 2015, Plaintiff or one of his employees purchased liquor for Levels from either a local retail establishment or from a retail establishment in Indiana, in violation of state law. (Dkt. 39 at ¶ 11). Plaintiff admits to only one instance of liquor being purchased in Indiana for use at Levels. (*Id.*). Additionally, Defendant learned that Plaintiff had filed an insurance claim after the fire, but following his interview with an insurance adjuster, Plaintiff stopped responding to the insurance adjuster. (*Id.* at ¶ 57). As a result, the insurance company denied any potential property loss claim for failure to comply with the insurance company's investigation. (*Id.*).

## VII.  History Between Plaintiff and Defendant

Defendant's arrival on the scene on October 24, 2015 was not the first time Plaintiff and Defendant had met. Some ten years earlier, in late 2005 or early 2006, at the Country Club Hills Fire Station where Plaintiff then worked, Defendant made a comment which Plaintiff interpreted as racially charged and directed at him. (Dkt. 39 at ¶¶ 69-70). Plaintiff advised the chief of the Fire Department of Defendant's comment, who in turn told Defendant that Plaintiff took offense to the statement. (*Id.* at ¶¶ 71-72). While Plaintiff asserts that the fire chief told him Defendant was

banned from the fire station as a result of his comment (and that Defendant and all leadership were notified of this ban), the chief has no recollection of ever banning anyone from the fire station. (*Id.* at ¶ 75). Plaintiff did not submit a formal written grievance to the Fire Department, the Office of the State Fire Marshal, or any other entity regarding the incident. (*Id.* at ¶ 74). The only interaction between Plaintiff and Defendant since that incident was a short conversation that occurred approximately one week later. (*Id.* at ¶ 73).

**VIII.** <u>**Plaintiff Charged with Arson**</u>

Prior to charging the Plaintiff with arson, Defendant and Agent Zito met with the Cook County Assistant State's Attorney (ASA), where Defendant and Agent Zito presented their evidence with Plaintiff in mind as a person of interest. (Dkt. 44 at ¶ 36). On January 17, 2017, the ASA sent out an email to his colleagues, explaining that he was approving charges against the Plaintiff. (*Id.* at ¶ 37). Specifically, the ASA stated: "A plastic bag containing a roll of paper towels, a hammer, and a cigarette lighter were found outside and under the window of the bar. [Plaintiff] denied knowledge of the bag or its contents and denied ever touching it, but his DNA was matched to a profile found on the roll of paper towels." (ASA Email, Dkt. 38-4).

On January 18, 2017, Plaintiff was arrested for arson. (Dkt. 39 at ¶ 58). He was held overnight in jail before appearing at his bond hearing the following day. (*Id.*). He was released on bond, the conditions of which included meeting monthly with a probation officer at the courthouse and asking for permission before traveling outside of Illinois. (*Id.* at ¶¶ 58, 61-62). Following a bench trial, Plaintiff was acquitted, with the court simply stating that the State had failed to meet its burden of proof beyond a reasonable doubt. (*Id.* at ¶¶ 65, 68).

Plaintiff originally filed this lawsuit on March 18, 2022, which proceeded before District Judge Kennelly and was voluntarily dismissed without prejudice by the Plaintiff. *Wilson v. Village*

*of Sauk Village et al.*, Case No. 1:20-cv-01861. In August 2022, Plaintiff filed the present action. (Compl., Dkt. 1).

## **LEGAL STANDARD**

A court may grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. All "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence."). Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted).

Finally, "speculation may not be used to manufacture a genuine issue of fact" to defeat summary judgment. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001).

## DISCUSSION

Defendant contends that summary judgment is appropriate for three reasons: (1) Plaintiff's claims are legally insufficient; (2) even if legally sufficient, there is no evidence that Defendant fabricated evidence; and (3) there was probable cause to arrest Plaintiff for arson even without the allegedly fabricated evidence. (Pl. Mem. in Supp. at 6-7, Dkt. 19). Having reviewed the parties' arguments and the relevant case law, the Court finds the Fourth Amendment claim is legally sufficient but fails because there was probable cause to arrest Plaintiff and no evidence that Defendant fabricated any material evidence. However, Plaintiff's Fifth Amendment claim is legally insufficient as a matter of law.

### I. Legal Sufficiency of Claims

#### a. Fourth Amendment

Plaintiff brings a section 1983 claim for malicious prosecution under the Fourth Amendment. (Compl. at ¶ 44, Dkt. 1), which the Supreme Court has held is legally cognizable. *Thompson v. Clark*, 596 U.S. 36, 42 (2022). "To succeed on [a Fourth Amendment malicious prosecution claim under 42 U.S.C. § 1983], a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person." *Chiaverini v. City of Napoleon, Ohio*, 144 S.Ct. 1745, 1748 (2024). A seizure must have occurred for a malicious prosecution claim to proceed. *Id.* at 1751.

Defendant argues that Plaintiff was not seized because he was only briefly detained—he spent only one night in jail after he was arrested and was released the following day after his bond hearing—and his bond conditions were standard. (Def. Mem. in Supp. at 7-10). Plaintiff contends, however, that his initial arrest and detention constitute a seizure. (Pl. Resp. at 8-9). Furthermore,

he does not suggest that his bond conditions constituted a seizure. (Pl. Resp. at 10) ("[T]he Defendant's reliance on several district court cases . . . that have ruled standard bond conditions such as the one at bar do not constitute a seizure are of no relevance because . . . the Plaintiff bases his seizure argument on his initial detention of false charges that were approved against him, and his continued detention for several hours even after being given an I-bond.").

Plaintiff has established that he was seized when arrested and detained overnight. A seizure occurs "'when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Artman v. Gualandri*, No. 20 C 4501, 2021 WL 2254961, at *4 (N.D. Ill. June 3, 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). It is well established that an arrest is a seizure for Fourth Amendment purposes. *Torres v. Madrid*, 592 U.S. 306, 312 (2021); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Therefore, Plaintiff's Fourth Amendment claim is viable.

###    b.  **Fifth Amendment**

A plaintiff may bring a claim of evidence fabrication as a due process violation under section 1983, but "[n]ot every act of evidence fabrication offends one's due process rights[.]" *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015). For instance, the Seventh Circuit has held that "due process is not implicated where . . . the defendant is released on bond following his arrest and acquitted at trial." *Id.* at 558. Defendant contends that Plaintiff's Fifth Amendment claim is legally insufficient because his acquittal on the arson charge forecloses any due process claim for evidence fabrication. (Def. Mem. in Supp. at 7). Plaintiff acknowledges that "Seventh Circuit precedence [sic] has long held that there can be no due process violation for fabricating evidence where there has been no conviction[.]" (Pl. Resp. at 11). Nevertheless, Plaintiff contends that "there is a basis to conclude that the Seventh Circuit would revisit its prior decision" on this point

in light of the Supreme Court's ruling in *McDonough v. Smith*, 139 S.Ct. 2149 (2019), and thus asks this Court to allow his Fifth Amendment claim to proceed. (Pl. Resp. at 12).

Defendant has the better argument. Plaintiff's acquittal bars a Fifth Amendment due process claim. The Supreme Court in *McDonough* made clear that it was reviewing the statute of limitations question that had been presented to the court. *See McDonough*, 139 S.Ct. at 2155 ("We assume without deciding that the Second Circuit's articulations of the right at issue [a fabricated evidence claim arising under the Due Process clause] and its contours are sound, having not granted certiorari to resolve those separate questions."). As such, *McDonough* stands solely for the proposition the limitations period for a section 1983 claim alleging prosecution based on fabricated evidence begins to run when criminal proceedings are terminated in defendant's favor. *Id.* at 2161. As such, this Court declines Plaintiff's invitation to presume that the Seventh Circuit would alter its current precedent holding that such a Fifth Amendment claim is not viable based solely on inferences drawn from the Supreme Court's decision. Defendant's Fifth Amendment due process claim is thus foreclosed.

## II.  **Probable Cause**

Finding that Plaintiff may proceed with his malicious prosecution claim under the Fourth Amendment, the Court must now determine whether there was probable cause to support his seizure. Probable cause is an absolute defense to a section 1983 action for both unlawful pretrial detention and malicious prosecution. *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006); *Norris v. Serrato*, 761 Fed. Appx. 612, 615 (7th Cir. 2019). "This is so even where the defendant officers allegedly acted upon a malicious motive[.]" *Mustafa*, 442 F.3d at 547. "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent

14

men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)) (quotations omitted).

Probable cause requires only a reasonable belief by an officer that the arrestee had committed a crime; the Seventh Circuit has explained that this is more than a "hunch," but less than a finding that, more likely than not, the arrestee committed a crime. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). The Supreme Court has further described probable cause as a "fluid concept—turning on the assessment of probabilities in particular factual contexts[.]" *Gates*, 462 U.S. at 232. Probable cause "depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "The principal component[] of a determination of . . . probable cause will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to . . . probable cause." *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996). Notably, "[d]etermining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Abbott*, 705 F.3d at 714. Based on his experience, an officer may draw inferences in determining whether probable cause exists. *Ornelas*, 517 U.S. at 700.

Putting to the side the alleged fabricated evidence—the planted paper towel roll and false edits to SA Gamboa's report—Defendant points to the following undisputed facts and argues that they established probable cause to arrest Plaintiff for arson: (1) Officer Vaughan observed Plaintiff alone in the Levels parking lot at 4:17 a.m. wearing a hood with his car parked in a secondary location; (2) Plaintiff was approximately $9,000 behind in rent payments and had already been threatened with eviction proceedings; (3) the bar was poorly managed, occasionally struggling to timely pay its employees or keep adequate change in the cash register; (4) Plaintiff had violated

15

state liquor laws; and (5) Plaintiff stopped cooperating with the insurance company on his claim. (Def. Mem. of Law in Supp. at 17, 19-20). The Court agrees that a reasonable officer, viewing these facts objectively, would have probable cause to arrest Plaintiff. In addition, the Court finds that Plaintiff has failed to establish a triable fact issue on the question of whether Defendant fabricated evidence.

### A.      The Scene of the Crime and Lack of Suspects

The Court begins with the initial observations of Officer Vaughan. The parties do not dispute that Plaintiff was the only individual Officer Vaughan saw at the scene of the crime, and that he did not see anyone else when, at Plaintiff's instruction, he ran east in pursuit of the alleged suspect and canvassed the area immediately surrounding the bar. Only Plaintiff was there wearing a hood and his car was parked in a secondary location away from the bar. Despite Plaintiff's explanation for his presence at 4:17 a.m. and his car being parked elsewhere, the mere fact that Plaintiff was outside, alone, in the middle of the night, at the scene of a fire at an establishment he rented, would raise a reasonable officer's suspicions.

Plaintiff contends that the true arsonist who punched him and fled the scene was an African American man of slender build with dreadlocks and a face covering. Thus, he urges the Court to rely upon Officer Vaughan's interview with the neighbor, who reported that an individual of slender build ran through his yard on the morning of the fire. Contrary to Plaintiff's arguments, though, this information does not corroborate his story. True, the neighbor said the individual had a slender build, but that one detail, standing alone, does not lead to the conclusion that Plaintiff and the neighbor, in fact, were talking about the same person. Significantly, the parties dispute exactly where Officer Vaughan's interview occurred and when the neighbor saw the individual run through his yard. But the record clearly reflects the interview did not occur across the street

16

from Levels as Plaintiff contends, but in a neighborhood behind Levels, across the street from the vacant house where Plaintiff had parked. More importantly, the neighbor said the subject ran through the yard sometime before Plaintiff retrieved his car from the vacant home (an hour after the fire), with no further details as to time. According to Plaintiff, this person of interest ran east, while the neighbor's yard was southwest of Levels. As such, the neighbor's statement do not create a triable fact dispute.

### B.      <u>Evidence Collected at the Scene</u>

Plaintiff next points to several disputed facts regarding the evidence at the scene, including when Defendant had Plaintiff sign a consent form, if Defendant entered Levels before obtaining consent, and whether Defendant planted the plastic bag with paper towels in it outside of Levels after he arrived. None of these, however, are genuine material facts that must be decided by a jury. First, it is undisputed that fire personnel were on the scene around 4:30 a.m., well before Defendant, and one of the firemen, Luther, observed a plastic bag outside of the bar when he arrived. Plaintiff offers nothing to suggest that Luther lied about this observation.

The parties disagree about what Defendant first did when he arrived on the scene, namely whether he had Plaintiff sign a consent form for him to enter the bar immediately or whether he recognized Plaintiff, canvassed the surrounding area, entered the bar, and then had Plaintiff sign the consent form. A picture of Plaintiff signing a document (which Defendant contends is the consent form) around 6:00 a.m. shows a bag on the ground in front of Levels, which is consistent with Luther's report of what he noticed before Defendant arrived. Plaintiff's attempt to submit a contradictory affidavit in opposition to summary judgment (Aff. of Samuel Wilson, Dkt. 38-1), challenging Defendant's actions upon arrival on the scene easily runs afoul of the "sham affidavit"

rule and therefore cannot be used to defeat summary judgment. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020).

Plaintiff finally contends that Defendant fabricated evidence and planted it outside of the broken window where the fire occurred because Defendant otherwise lacked probable cause to arrest Plaintiff. But the record does not support Plaintiff's theory. It is undisputed that no witness, including Plaintiff himself, observed Defendant remove the plastic bag with paper towels and place it outside of the bar. Plaintiff argues that this is to be expected, as the nature of evidence fabrication is inherently secretive, and no smoking gun is required. But Plaintiff needs more than speculation to survive summary judgment. Misconduct is often conducted in secret; this does not permit a plaintiff to rely on speculation alone that it has occurred, though.

As Defendant points out, Plaintiff does not state when or how he thinks this could have occurred. Plaintiff notes Myers' testimony that there may have been times when the bar door was not guarded, but that too is speculative. Plaintiff also claims that he did not see Defendant plant the evidence because he fell asleep during the investigation, but he conveniently ignores the plethora of other witnesses who also did not see Defendant plant any evidence. Simply put, all Plaintiff has to support his theory that Defendant must have planted the plastic bag and paper towel rolls containing his DNA outside the bar is his own self-serving statements, which he tries to improperly characterize as "circumstantial evidence." While circumstantial evidence could create a genuine issue of material fact, Plaintiff's speculation cannot.

### C.  <u>Possible Motives</u>

Plaintiff argues that, because he rented the property rather than owned it, he lacked any financial motive to commit the arson. But Defendant had ample evidence that Plaintiff may have stood to gain financially from a fire at Levels. While Plaintiff rented the real estate, he owned the

content and fixtures inside of the bar. During his investigation, Defendant received documents related to the property insurance policy in place at the time of the fire. (*See generally* Dkt. 18-26). Those documents indicated that the policy covered personal property. (First Report of L.J. Shaw & Co. at 2, Dk. 18-26). In fact, Plaintiff filed a claim with the insurance company that his insurer tried to investigate. But after contacting Plaintiff on five separate occasions after his initial interview with the insurance adjuster and receiving no response, the insurance company denied the claim.

A reasonable officer armed with this information would have believed that Plaintiff was financially motivated to commit the crime and recover from the insurance company. Defendant's investigation revealed that at the time of the fire, Plaintiff was approximately $9,000 behind in rent payments and had already been threatened with eviction. Regardless of whether Plaintiff believed the landlord was wrong, an officer could reasonably assume that Levels was in financial straits. Employees reported that the alcohol, at a *bar*, was rarely restocked in a timely manner and they were not paid in a timely fashion. One employee also told Defendant that on occasion, there was insufficient change in the cash register to make change for customers and that she once overheard the Plaintiff tell a patron that he was tired of owning the bar. Finally, Plaintiff appeared to be making ad hoc alcohol purchases for the bar. One employee relayed that she never saw an alcohol distributor at Levels. Plaintiff admits that on at least one occasion he purchased liquor from a retail establishment in Indiana to sell at the bar, in violation of state liquor laws. Considering the totality of the circumstances, an objectively reasonable police officer could have determined that Plaintiff had both motive and opportunity to commit the arson.

Relatedly, Plaintiff points to the three individuals Defendant identified as the prior vandals as suspects for the arson, arguing that those individuals had a greater motive than he did (namely,

revenge and anger) and they lend credence to Plaintiff's explanation as to why he was outside at the bar in the middle of the night. But a reasonable officer may just as easily conclude that the prior vandals provided a scapegoat on which Plaintiff was attempting to pin an arson from which he stood to gain financially. And Plaintiff points to no evidence to dispute Defendant's conclusion that these individuals were not suspected of committing the arson.

While Plaintiff denies that he had any motive to set Levels ablaze, he contends that Defendant had a motive to frame him for the crime. Plaintiff points to he and Defendant's interaction in late 2005 or early 2006, ten years earlier, which Plaintiff contends resulted in Defendant being banned from the Country Club Hills Fire Department, as evidence of Defendant's illegal motive. While the parties' dispute about Defendant's motive may be genuine, it is not material. A probable cause analysis is purely objective; "the officer's subjective state of mind and beliefs are irrelevant." *Abbott*, 705 F.3d at 714. Therefore, any contention by Plaintiff that the Defendant had a motive to frame him has no bearing on the probable cause analysis.

### D. <u>Decision to Charge Plaintiff and Edits to SA Gamboa's Report</u>

Plaintiff emphasizes the fact that the presence of his DNA on the paper towel roll was central to the ASA's charging decision and points to the email the ASA sent to his staff on January 17, 2017, the day before Plaintiff was arrested, as proof. The laboratory report indicating that Plaintiff's DNA was found on the paper towel roll was dated December 11, 2015, which predated the conclusion of Defendant's investigation.[2] Nevertheless, the ASA's decision to charge the Plaintiff is not critical to the question of whether a reasonable officer would have probable cause to arrest him. Probable cause deals only with whether there is a reasonable belief that a suspect has

---

[2] While it is unclear exactly when Defendant's investigation concluded or why Plaintiff was not arrested and charged until January 2017, the record reflects that Defendant was still investigating the incident in July 2016, as that is when he and ATF Agent Zito conducted interviews of Levels employees.

committed a crime, while a charging decision may rest on whether the prosecutor believes that they can prove their case beyond a reasonable doubt. An objective officer would have reasonably believed that Plaintiff committed the arson, and this conclusion stands regardless of what the ASA considering in making his charging determination.

Finally, the Plaintiff makes much of the fact that Defendant edited SA Gamboa's report to include that Plaintiff observed the offender carrying a plastic bag as he approached the bar and that Plaintiff denied handling the bag or its contents. But these edits, whether accurate or not, are simply immaterial to the analysis. There is no dispute that Defendant edited the report on February 7, 2017, weeks after the decision to charge Plaintiff and Plaintiff's subsequent arrest had been made. Even assuming, for the sake of argument alone, that Defendant's edits were fabricated, the timing renders it impossible that they played any role in the determination of whether there was probable cause to arrest Plaintiff. Therefore, any dispute about Defendant's edits to SA Gamboa's report, or their significance in the probable cause analysis, are not material factual disputes.

In sum, a reasonable officer, considering the totality of the circumstances and viewing the evidence objectively, had probable cause to arrest Plaintiff for arson, and no reasonable jury could find otherwise, let alone conclude that Defendant fabricated evidence. Because probable cause exists, his Fourth Amendment challenge fails.

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendant's motion for summary judgment is granted. Judgment is entered in favor of Defendant.

**DATED**: November 12, 2024           **ENTERED**:

LASHONDA A. HUNT
United States District Judge